IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| THOMAS W. NOE, | ) | CASE NO. 3:11CV1173 |
| | ) | |
| Petitioner, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| FRANCISCO PINEDA, Warden | ) | |
| | ) | |
| | ) | REPORT & RECOMMENDATION |
| Respondent. | ) | |

In 2006, following a jury trial in the Lucas County Court of Common Pleas, petitioner Thomas W. Noe ("Noe" or "Petitioner") was convicted of one count of engaging in a pattern of corrupt activity, two counts of aggravated theft,  four counts of money laundering, four lesser included counts of tampering with records, and eighteen counts of forgery.  Doc. 7-1, pp. 123-125 (Ex. 14).  The trial court sentenced Noe to a total of eighteen years of imprisonment and imposed fines of $139,000.00.  *State of Ohio v. Thomas W. Noe,* Case No. CR-2006-1348, Doc. 7-1, pp. 123-125 (Ex. 14).  The trial court also ordered restitution and financial sanctions.  Doc. 7-1, pp. 155-156 (Ex. 17).

On June 7, 2011, after exhausting his state appeals, Noe filed this federal habeas corpus action pursuant to 28 U.S.C. § 2254.  Doc. 1.  Noe challenges the constitutionality of his conviction and asserts three grounds for relief:

**Ground One**: Improper denial of motion to change venue.

**Ground Two**: Improper allowance of expert testimony on behalf of the State.

**Ground Three**: Improper denial of Defendant's expert testimony.

Doc. 1.

1

This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2.[1]  For the reasons set forth below, the undersigned concludes that all of Noe's grounds for relief are without merit.  Accordingly, the undersigned recommends that Petitioner Thomas W. Noe's Petition for writ of habeas corpus (Doc. 1) be **DENIED**.

## I.  Factual Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 2878 (2009). The facts in this case are set forth in the opinion of the Ohio Sixth District Court of Appeals as follows:[2]

> {¶ 2} The relevant facts are as follows. In 1997, the Ohio General Assembly permitted the Ohio Bureau of Workers' Compensation ("BWC") to diversify its large investment portfolio with alternative investments. To that end, and under the BWC's Emerging Managers Program, appellant, a rare coin dealer, submitted a proposal to the BWC to establish Capital Coin Fund, a limited liability company, with the primary purpose of buying and selling of rare coins. On March 31, 1998, the operating agreement creating Capital Coin Fund, Ltd. ("CCF I") was signed by the BWC and appellant. Under the terms of the agreement, the BWC was to provide $25,000,000 as its capital contribution (in exchange for 250 units of interest) while appellant's company, Vintage Coins and Cards ("VCC"), and Delaware Valley Rare Coin Co., Inc., a Pennsylvania Company, as managing members of CCF I, each contributed $5,000 (in exchange for one manager/member unit each.) Section 5.1 of the operating agreement provided that "the Managers, in their full and exclusive discretion, shall manage and control and make all decisions affecting the business and assets of the Company * * *."

---

[1] The case was initially referred to United States Magistrate Judge McHargh but was reassigned to the undersigned Magistrate Judge pursuant to General Order 2011-18.

[2] The facts are taken from the Sixth District Court of Appeals' December 31, 2009, decision. *State of Ohio v. Thomas W. Noe*, 2009 WL 5174163, *1-3 (6th Dist. 2009)*; *see also* Doc. 7-1, pp. 573-625 (Ex. 32).  Noe has not demonstrated by clear and convincing evidence that the state court's factual findings were incorrect.  Accordingly, the state court's findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d at 397.

{¶ 3} On July 13, 2001, Capital Coin Fund, Ltd. II ("CCF II") was formed. As with CCF I, the BWC invested $25,000,000; appellant, as the sole manager, invested $10,000 through VCC. Again, the purpose of CCF II was to buy and sell rare United States coins. CCF II also gave the manager authority to make unspecified "alternative investments."

{¶ 4} Appellant believed that it was important to conceal the nature of the BWC investments from other coin dealers. Accordingly, appellant set up various companies to conceal the relationship. For CCF I, appellant created Rare Coin Enterprises ("RCE") in Maumee, Ohio, and in Broomall, Pennsylvania; Visionary Rare Coins in California; and Karl D. Hirtzinger, LLC, in Minnesota. For CCF II, appellant created Rare Coin Alliance in Delaware, Errors and Oddities in Florida, Spectrum Fund in California, and Numismatic Professionals in Colorado. The entities involved in the criminal prosecution were those run by appellant in Maumee, Ohio. Such entities included CCF I, CCF II, VCC, and RCE.

{¶ 5} Following the organization of CCF I, the BWC began questioning some of the transactions that were being approved by appellant. In 2005, an official investigation commenced regarding the management of the Coin Funds. Based upon information obtained during the initial investigation, a search warrant for VCC, located in Maumee, Lucas County, Ohio was executed on May 26, 2005. Computers, voluminous paper records, coins and various other collectibles were seized.

{¶ 6} On February 13, 2006, a fifty-three count indictment was filed against appellant. Specifically, appellant was indicted on one count of engaging in a pattern of corrupt activity, 11 counts of theft, 11 counts of money laundering, eight counts of tampering with records, and 22 counts of forgery. On February 15, 2006, appellant entered a not guilty plea as to all the counts.

{¶ 7} On February 27, 2006, appellant filed an affidavit in the Supreme Court of Ohio requesting that the assigned trial judge, Honorable Thomas J. Osowik, and all the judges of the Lucas County Court of Common Pleas, be disqualified from presiding over his case. In his memorandum in support, appellant chronicled his lengthy involvement with the Ohio Republican Party and, particularly, the Lucas County Republican Party. Appellant specified that this involvement included his and his wife's active campaigns against all democratic judicial candidates, Judge Osowik included. In response, Judge Osowik stated that he felt no bias or prejudice against appellant and that he could fairly and impartially serve on the case. The Administrative Judge, Honorable James D. Bates, filed a response to appellant's affidavit indicating that, if Judge Osowik should be disqualified, the remaining Lucas County judges were able to preside over the case. On March 8, 2006, the court denied the affidavit of disqualification. See In re Disqualification of Osowik, 117 Ohio St.3d 1237, 884 N.E.2d 1089, 2006-Ohio-7224.

{¶ 8} On May 19, 2006, appellant filed a motion to change venue; appellant argued that the "overwhelmingly negative pre-trial publicity," chiefly articles and

editorials published in The Toledo Blade, prevented him from having a fair trial in Lucas County. Following extensive briefing and a hearing on the issue on July 6, 2006, the trial court denied appellant's motion.

{¶ 9} On May 26, 2006, appellant filed a motion to dismiss Count 1 of the indictment. On June 21, 2006, appellant filed a motion to consolidate Counts 4, 6, 8, 10, 12, 14, 16, 18, and 20 into one count of theft, Count 2. The trial court denied appellant's motion to dismiss Count 1, but granted appellant's motion to consolidate. The state entered a nolle prosequi as to Count 21.

{¶ 10} A jury trial commenced on October 10, 2006. Following extensive voir dire, 12 jurors and four alternate jurors were seated. The state presented the testimony of 53 witnesses and numerous exhibits. The state issued a nolle prosequi as to four forgery counts where the witness died prior to trial.

{¶ 11} The state's theory at trial was that appellant transferred money from the coin funds to VCC and characterized the transfers as coin purchases when, in fact, no coins were purchased. Appellant then used the money for his own benefit. Appellant also wrote several checks from VCC to certain individuals; appellant endorsed the checks and deposited the proceeds into his personal checking account. Further, VCC employee Timothy LaPointe, at appellant's direction, created inflated inventories in order to deceive the BWC as to the amount of coins owned by the Coin Funds. Prior to agreed-on inspections, appellant and LaPointe would also borrow or obtain coins from various customers and coin dealers and create corresponding false inventories.

{¶ 12} At the conclusion of the state's case-in-chief, appellant raised a Crim.R. 29(A) motion for acquittal. As to the theft, money laundering, and tampering with records charges, appellant argued that because no evidence was presented to demonstrate what "consent" was given by the Coins Funds to appellant, the elements of theft, and the charges predicated on theft, were not supported by sufficient evidence. Further, as to the forgery counts, appellant contended that the activity alleged was not illegal because appellant did not intend to defraud the individuals who were listed as payees and whose signatures he signed. Appellant further argued that the state failed to establish the existence of an enterprise with regard to the engaging in a pattern of corrupt activity charge. Following the arguments of the parties, the trial court denied the motion. The state then rested; the defense did not present any witnesses and rested.

Doc. 7-1, pp. 574-578, ¶¶ 2-12 (Ex. 32).

## II.  Procedural Background

### A.  State Conviction

#### 1.  Indictment

4

In February 2006, a Lucas County grand jury issued a 53-count indictment charging Noe with one count of engaging in a pattern of corrupt activity in violation of Ohio Revised Code § 2923.32(A)(1); five counts of grand theft in violation of Ohio Revised Code § 2913.02(A)(2), (B)(1) and (B)(2); six counts of aggravated theft in violation of Ohio Revised Code § 2913.02(A)(2), (B)(1) and (B)(2); eleven counts of money laundering in violation of Ohio Revised Code § 1315.55(A)(1) and/or (A)(3); eight counts of tampering with records in violation of Ohio Revised Code § 2913.42; and twenty-two counts of forgery in violation of Ohio Revised Code § 2913.31(A)(1) and/or (A)(3).  Doc. 7-1, pp. 6-35 (Ex. 1).

## 2.  Motions and Objections

On May 19, 2006, Noe filed a pre-trial Motion to Change Venue.  Doc. 7-1, pp. 36-50 (Ex. 2).   Noe argued that he could not receive a fair trial in Lucas County because of "intensely negative and prejudicial media coverage."  Doc. 7-1, p. 37.  On June 12, 2006, the State filed a Memorandum Opposing Defendant's Motion for Change of Venue.  Doc. 7-1, pp. 51-64 (Ex. 3).  On June 14, 2006, Noe filed Supplemental Evidence in Support of his Motion for Change of Venue.  Doc. 7-1, pp. 65-66 (Ex. 4).  On June 14, 2006, the trial court conducted a hearing on Noe's Motion to Change Venue.  Doc. 7-1, p. 67 (Ex. 5); Doc. 9-1, pp. 36-57 (June 14, 2006, Hearing Transcript).  The trial court denied the motion as premature.  Doc. 7-1, p. 67 (Ex. 5); Doc. 9-1, p. 56.  Noe subsequently filed supplemental evidence in support of his motion for change of venue.  Doc. 7-1, pp. 68-85 (Ex. 6, 7, 8, 9, 10).

During an October 6, 2006, pre-trial hearing, Noe objected to presentation of expert testimony from Sotheby employees regarding valuation of assets.  Doc. 9-2, pp. 245-246, 249-252 (October 6, 2006, Hearing Transcript).

On October 16, 2006, the State filed a Motion in Limine seeking to bar Noe from presenting evidence and/or argument regarding the value of assets, coins and collectibles

5

possessed by the coin funds after Noe was removed as manager of the coin funds.  Doc. 7-1, pp.

86-102 (Ex. 11).  Noe opposed the State's Motion in Limine.  Doc. 7-1, pp. 103-120 (Ex. 12).

On October 31, 2006, the trial court granted the State's Motion in Limine.  Doc. 7-1, pp. 121-122

(Ex. 12).  In granting the State's Motion in Limine, the trial court concluded that "testimony

regarding the Coin Fund's valuation subsequent to the defendant's management and possession

could not make any fact of consequence more or less probable" and that "[e]vidence of

prospective ability to repay is not relevant to the charges contained in the indictment nor could

such evidence make any fact of consequenec more or less probable."  Doc. 7-1, pp. 121-122 (Ex.

13).

### 3. Jury Trial and Sentencing

Jury selection commenced on October 10, 2006 and concluded on October 12, 2006.

Doc. 9-3, pp. 2-857 (Trial Tr. Vols. I-III).  The trial proceedings resumed on October 16, 2006,

and on November 8, 2006, the trial court instructed the jury and the jury began its deliberations.

Doc. 9-3, pp. 857-4373 (Trial Tr. Vols. IV-XX).  On November 13, 2006, the jury returned a

verdict finding Noe guilty of one count of engaging in a pattern of corrupt activity (with a special

verdict of forfeiture of the voting shares of stock in Numismatic Guaranty Corporation of

America), two counts of aggravated theft, four counts of money laundering, four lesser included

counts of tampering with records, and 18 counts of forgery.  Doc. 7-1, pp. 123-125 (Ex. 14);

Doc. 9-3, pp. 4382-4391 (Trial Tr. Vol. XXII).   On November 20, 2006, the trial court

sentenced Noe to a total of 18 years in prison and imposed fines totaling $139,000.00.  Doc. 7-1,

pp. 123-125 (Ex. 14).

On November 17, 2006, the State filed a Motion for Restitution and Financial Sanctions.

Doc. 7-1, pp. 126-148 (Ex. 15).  Noe filed an Opposition (Doc. 7-1, pp. 149-154 (Ex. 16)) and,

on November 27, 2006, the trial court conducted a restitution hearing (Doc. 7-1, pp. 155- (Ex.

17); Doc. 9-2, pp. 304-353 (November 27, 2006, Restitution Hearing Transcript).  On December 7, 2006, the trial court ordered Noe to make restitution in the amount of $13,747,000.00 and to pay the costs of prosecution in the amount of $2,979,402.89.  Doc. 7-1, pp. 155-156 (Ex. 17).

### B.  Direct Appeal

On December 15, 2006, Noe filed a Notice of Appeal to the Sixth District Court of Appeals.  Doc. 7-1, pp. 157-158 (Ex. 18).  In his Brief, Noe asserted seven assignments of error.[3] Doc. 7-1, pp. 159-267 (Ex. 19).  Noe also filed a Motion to Supplement Record and Brief in Support (Doc. 7-1, pp. 268-283 (Ex. 20)) and an Amended Appendix to his Appellate Brief.

---

[3] Noe's seven assignments of error were:

1. The State failed to present any evidence on at least one element of each crime charged in the indictment in violation of Mr. Noe's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 10, and 16 of the Ohio Constitution.

2. The trial court violated Mr. Noe's right to a fair trial as guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution by holding this trial in Lucas County, Ohio, an area overwhelmingly saturated with negative publicity about Mr. Noe and his alleged guilt.

3. The denial of Mr. Noe's affidavit of disqualification violated Mr. Noe's right to a fair trial as guaranteed by Sixth and Fourteenth Amendment rights to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

4. The trial court abused its discretion with regard to various evidentiary decisions that denied Mr. Noe a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitutions.

5. The trial court abused its discretion in refusing to instruct the jury on essential components of Mr. Noe's defense, denying Mr. Noe a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

6. Mr. Noe's convictions for theft and money laundering were allied offenses of similar import, and sentences for both offenses violated Mr.  Noe's rights against double jeopardy guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

7. The trial court's cumulative trial and sentencing errors violated Mr. Noe's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Article I, Sections 9 and 10, to the Ohio Constitution and Ohio's sentencing framework.

Doc. 7-1, pp. 159-267 (Ex. 19).

Doc. 7-1, pp. 284-379 (Ex. 21).  The State filed a Brief in response (Doc. 7-1, pp. 380-456 (Ex. 22))[4] and Noe filed a Reply (Doc. 7-1, pp. 457-486 (Ex. 23)).[5]  On December 31, 2009, the court of appeals found Noe's first through sixth assignments of error not to be well-taken and affirmed the judgment of the Lucas County Court of Common Pleas.  Doc. 701, pp. 573-625 (Ex. 32).  The court of appeals found Noe's seventh assignment of error to be well-taken in part, i.e., with regard to the imposition of post-release control.  Doc. 7-1, p. 624 (Ex. 32).  The court of appeals remanded the case for a post-release control hearing in accordance with Ohio Revised Code § 2929.191.[6]  Doc. 7-1, pp. 574-625 (Ex. 32).

On February 16, 2010, Noe filed a Notice of Appeal with the Ohio Supreme Court.  Doc. 7-1, pp. 626-679 (Ex. 33).  In his Memorandum in Support of Jurisdiction, Noe raised eleven propositions of law.[7]  Doc. 7-1, pp. 680-750 (Ex. 34).  The State filed a Notice of Cross-Appeal

---

[4] Following oral argument, the State filed the State of Ohio's Supplemental Authority.  Doc. 7-1, pp. 487-490 (Ex. 24).  Noe filed a Response to the State's Supplemental Authority Presented at Oral Argument.  Doc. 7-1, pp. 491-497 (Ex. 25).

[5] On June 5, 2009, the Ohio Court of Appeals determined sua sponte that the trial court's sentencing entry did not comply with Crim. R. 32(C) and was therefore not a final appealable order.  Doc. 7-1, pp. 498-500 (Ex. 26).  The appellate court ordered the trial court to issue a revised sentencing entry.  Doc. 7-1, p. 500 (Ex. 26).  The trial court thereafter issued the revised sentencing entry.  Doc. 7-1, pp. 501-504 (Ex. 27).  On July 1, 2009, the Ohio Court of Appeals issued a decision reinstating the case to its docket.  Doc. 7-1, p. 507 (Ex. 28).  Noe appealed from the revised judgment entry.  Doc. 7-1, pp. 508-511 (Ex. 29).  On July 22, 2009, the Ohio Court of Appeals granted Noe's Motion to Consolidate his July 15, 2009, appeal with the reinstated court of appeals case.  Doc. 7-1, p. 570 (Ex. 30).

[6] On October 5, 2010, the trial court conducted the hearing on remand and the trial court issued a judgment entry. Doc. 7-1, p. 790 (Ex. 38); Doc. 7-1, pp. 791-794 (Ex. 39).

[7] Noe's eleven propositions of law were:

    1.  The trial court abused its discretion when it failed to recognize that pretrial publicity had been so adverse that a presumption of prejudice arose which was not rebutted by the State, thus denying the defendant his rights to due process of law and a fair trial under the Fifth and Sixth Amendments of the Constitution to the United States.

    2.  The trial court abused its discretion when it failed to recognize that witnesses were necessarily testifying as experts and allowed their evidence over the proper objection of the defendant, thus denying defendant his rights to due process of law and a fair trial under the Fifth and Sixth Amendments of the Constitution of the United States.

    3.  The trial court abused its discretion when its discretion when it prohibited the defendant from offering expert testimony supportive of defendant's innocent intent,

(Doc. 7-1, pp. 752-753 (Ex. 35), and a Memorandum in Support of Jurisdiction and a Response

to Noe's Memorandum in Support of Jurisdiction (Doc. 7-1, pp. 754-788 (Ex. 36)).[8]  On June 9,

---

which denied defendant his rights to due process of law and a fair trial under Fifth and Sixth Amendments of the Constitution of the United States.

4.  The trial court allowed a conviction for forgery when the payees had no interest in the subject checks and suffered no loss, which denied defendant his rights to due process of law and fair trial under the Fifth and Sixth Amendments of the Constitution of the United States.

5.  The trial court permitted a conviction for forgery that defendant facilitated any fraud through the use of allegedly forged checks, which denied defendant his rights to due process of law and a fair trial under the Fifth and Sixth Amendments of the Constitution of the United States.

6.  The trial court erred in allowing defendant's conviction of a pattern of corrupt activity without proper proof of the predicate offenses, which denied defendant his rights to due process of law and a fair trial under the Fifth and Sixth Amendments of the Constitution of the United States.

7.  Defendant's conviction was improper because all Judges from Lucas County Court of Common Pleas should have been disqualified, which denied defendant his rights to dues process of law and a fair trial under the Fifth and Sixth Amendments to the Constitution of the United States.

8.  The trial court erred in finding that defendant's conviction for theft and money laundering were not allied offenses of similar import, which denied defendant his rights to due process of law and a fair trial under the Fifth and Sixth Amendments of the Constitution of the United States.

9.  The trial court erred by relying upon a void statute and engaged in prohibitive fact-finding and sentencing defendant to a term of incarceration beyond the statutory minimum, which denied defendant his rights to due process of law and a fair trial under the Fifth and Sixth Amendments of the Constitution of the United States.

10.  The trial court erred by imposing a sentence which punished defendant for proceeding to trial rather than pleading guilty which denied defendant his rights to due process of law and a fair trial under the Fifth and Sixth Amendments of the Constitution of the United States.

11.  The trial court erred in failing to determine the amount of restitution with a reasonable degree of certainty, which denied defendant his rights to due process of law and a fair trial under the Fifth and Sixth Amendments of the Constitution of the United States.

Doc. 7-1, pp. 680-750 (Ex. 34).

[8] The State asserted one proposition of law in its memorandum in support of jurisdiction: "For a first or second degree felony conviction (or sex offense conviction) that occurs after July 11, 2006, an offender is subject to post-release control as a matter of law regardless of the notice given by the trial court at sentencing."  Doc. 7-1, p. 754-788 (Ex. 36).

2010, the Ohio Supreme Court denied leave to appeal and leave to cross-appeal.  Doc. 7-1, p. 789 (Ex. 37).

### C.  Post-Conviction Petition

On August 21, 2008, Noe filed, in the Lucas County Court of Common Pleas, a Motion for Leave to File Motion for New Trial with a Memorandum in Support wherein he sought relief based on alleged juror misconduct.  Doc. 7-1, pp. 795-796 (Ex. 40); Doc. 7-1, pp. 797-804 (Ex. 41).  The State filed a Motion to Strike/Memorandum Opposing Motion for New Trial.  Doc. 7-1, pp. 987-995 (Ex. 45).   On September 29, 2008, the trial court granted the State's Motion to Strike [affidavit] and denied Noe's request to seek a new trial.  Doc. 7-1, pp. 996-1002 (Ex. 46).

Noe also filed a Petition for Post-Conviction Relief and Amended Petition for Post-Conviction Relief.  Doc. 7-1, pp. 805-806 (Ex. 42); Doc. 7-1, pp. 807-808 (Ex. 43).  In his Memorandum in Support of his Petition for Post-Conviction Relief, Noe raised two grounds for relief.[9]  Doc. 7-1, pp. 809-986 (Ex. 44).  The State filed a Motion to Dismiss/Motion for Summary Judgment regarding Amended Petition for Post-Conviction Relief.  Doc. 7-1, pp. 1003-1015 (Ex. 47).  On December 8, 2008, the trial court granted the State's Motion to Dismiss/Motion for Summary Judgment.  Doc. 7-1, pp. 1016-1019 (Ex. 48).

### D.  Federal Habeas Petition

On June 7, 2011, Noe filed his petition for writ of habeas corpus ("Petition").  Doc. 1. Noe asserts three grounds for relief, which are set forth at page 1 above.  On September 19,

---

[9] Noe's Post-Conviction Petition grounds for relief were:

1.  Mr. Noe was deprived of a fair trial when the jurors violated their oaths and failed to decide the case on the evidence at trial.

2.  The trial court unconstitutionally ordered restitution that failed to account for, and amounted to a taking of, Mr. Noe's interest in property of the coin funds that the State sold.

Doc. 7-1, pp. 815-821 (Ex. 44).

2011, the Respondent filed his Answer/Return of Writ.  Doc. 7.  On November 18, 2011, Noe

filed his Traverse.  Doc. 11.  With leave of Court, on March 16, 2012, Noe filed a Supplemental

Brief.  Doc. 17-2.  Thereafter, on April 3, 2012, Respondent filed a Reply to Noe's Supplemental

Brief.  Doc. 18.

### III. Merits Review

### A.  Standard of Review under the AEDPA

 "[F]ederal habeas corpus relief does not lie for errors of state law."  *Estelle v. McGuire,

502 U.S. 62, 67 (199*1) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (19*90)).  Rather, in order to

state a claim for habeas relief, a petitioner must allege that he "is in custody in violation of the

Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

Congress adopted the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No.

104-132, 110 Stat. 1214 ("AEDPA"), to clarify the standard that a habeas petitioner must meet.

The provisions of the AEDPA apply to Noe's habeas petition because he filed it after the

effective date of the AEDPA.  *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 20*07).  In particular,

the controlling AEDPA provision states:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
>     application of, clearly established Federal law, as determined by the
>     Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination
>     of the facts in light of the evidence presented in the State court
>     proceeding.

28 U.S.C. § 2254(d).

A decision is "contrary to" clearly established federal law when the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)).  A state court's adjudication only results in an "unreasonable application" of clearly established federal law when the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.  *Id.* at 599-600 (quoting *Williams*, 529 U.S. at 413).

In order to obtain federal habeas corpus relief, therefore, a petitioner must have raised and exhausted his federal constitutional claims in state court and must establish that the state court's decision regarding those claims was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Bobby v. Dixon*, ____ U.S. ____, 132 S.Ct. 26, 27, 181 L.Ed.2d 328 (Nov. 7, 2011) (quoting *Harrington v. Richter*, ____ U.S. ____, 131 S.Ct. 770, 786–87 (2011).  This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  *Richter*, 131 S.Ct. at 786 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment)).  In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)).  The petitioner carries the burden of proof.  *Cullen v. Pinholster*, ____ U.S. ____, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011).

For the reasons discussed below, Noe has not met his burden in this case.

**B.   Ground One is without merit.**

In Ground One,[10] Noe contends that the trial court's failure to change venue denied him a fair trial under the United States Constitution.  Doc. 1, pp. 15-20; Doc. 11; Doc. 17-2, pp. 2-3. He argues that "[f]rom the time of the initial investigation through the trial there was a steady and unrelenting expansion of [media] coverage."[11]  Doc. 1, pp. 15-16.  He further argues that "[t]he barrage of publicity in this case was particularly poisonous since Thomas Noe and his wife were well-known figures in Northwest Ohio and particularly Toledo."  Doc. 17-2, p. 2.  Noe contends that, in his case, the combination of "claims to injured workers, a national political scandal implicating a beleaguered President, and money swirling around in the political process" made for a volatile mix not unlike that in *Sheppard v. Maxwell*, 384 U.S. 333 (1966).  Doc. 1, p. 15 (arguing that the *Sheppard* case was "well publicized because of its combination of murder, mystery, society, sex and suspense.").  He asserts that "[t]he failure [of the trial court] to move this case violated the principles articulated by the United States Supreme Court from *Estes v. Texas*, 381 U.S. 532 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333 (1966) to *Skilling* [*v. United States of America*, 130 S.Ct. 2896 (2010).]"  Doc. 17-2, p. 3.

To the extent that Noe attempts to obtain relief on the basis that the Ohio Court of Appeals' decision was contrary to or an unreasonable application of *Skilling*, Noe's argument is misplaced because the Supreme Court decided *Skilling* after Noe's direct appeal had been completed.[12]  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1399 (2011) (quoting *Lockyer v. Andrale*,

---

[10] Noe raised this claim in his second assignment of error in the state appellate court (Doc. 7-1, pp. 191-197 (Ex. 19) and in his first proposition of law in his Ohio Supreme Court memorandum in support of jurisdiction (Doc. 7-1, pp. 688-692 (Ex. 34)).

[11] Noe states that there were more than 1,500 pages of news coverage.  Doc. 1, p. 17.

[12] *Skilling* was decided on June 24, 2010.  The Ohio Court of Appeals issued its decision on Noe's direct appeal on December 31, 2009 (Doc. 7-1, pp. 573-625 (Ex. 32) and the Ohio Supreme Court declined jurisdiction on June 9, 2010 (Doc. 7-1, p. 789 (Ex. 37); Doc. 7-1, p. 1094 (Ex. 52)).

538 U.S. 63, 71-72 (2003)) (internal quotations omitted) (when reviewing a state court's decision under 28 U.S.C. § 2254(d)(1), the court measures the state court's decision against the U.S. Supreme Court's "precedent as of the time the state court renders its decision").  Nevertheless, the *Skilling* opinion is useful in analyzing Noe's first ground for relief because it reviewed the established federal law relating to claims of a denial of a right to a trial by an impartial jury and applied those standards when it affirmed the denial of a motion to change venue in the criminal trial of a former chief executive officer of Enron.  *Skilling*, 130 S.Ct. 2896.

"A fair trial in a fair tribunal is a basic requirement of due process."  *Irvin v. Dowd*, 366 U.S. 717, 722 (19*61).  The *Skilling* Court reiterated that "the theory of our trial system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."  *Id.* at 2914 (quoting *Patterson v. Colorado ex rel. Attorney General of Colo.*, 205 U.S. 454, 462 (19*07)).  After describing *Rideau v. Louisiana*, 373 U.S. 723 (1963),[13] *Estes v. Texas*, 381 U.S. 532 (1965),[14] and *Sheppard v. Maxwell*, 384 U.S. 333 (1966)[15] as cases where convictions had been overturned because the trial atmosphere "was utterly corrupted by press coverage," the Court indicated that those "decisions, however, 'cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process.'"  *Id.* at 2914 (quoting *Murphy v. Florida*, 421 U.S. 794, 798-99 (1974)).  "The petitioner bears the

---

[13] In *Rideau*, the defendant's videotaped police interrogation including his confession was televised on three separate occasions prior to trial.  *Skilling*, 130 S.Ct. at 2913-14.

[14] In *Estes*, "the media's overzealous reporting efforts . . . led to considerable disruption and denied the judicial serenity and calm to which Billie Sol Estes was entitled."  *Skilling*, 130 S.Ct. at 2914 (citing and quoting *Estes*, 381 U.S. at 536) (internal quotations omitted).

[15] In *Sheppard*, "[b]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom thrusting jurors into the role of celebrities."  *Skilling*, 130 S.Ct. at 2914 (citing and quoting *Sheppard*, 384 U.S. at 353, 355) (internal quotations omitted).   The Court in *Skilling* noted that "Sheppard's case involved more than heated reporting pretrial: We [the Court] upset the murder conviction because of a 'carnival atmosphere.'"  *Id.* (citing and quoting *Sheppard*, 384 U.S. at 358) (internal quotations omitted).

burden of showing utter corruption of the proceedings." *Turnage v. Wilson*, 2006 WL 2380623, *2, (N.D. Ohio Aug. 14, 2006) (citing *Dobbert v. Florida*, 432 U.S. 282, 303 (1976) wherein the petitioner had only proved that the jury pool was well aware of the case). "Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require ignorance." *Skilling*, 130 S.Ct. at 2914-15 (citing *Irvin*, 366 U.S. at 722) (emphasis in original).[16] "A presumption of prejudice, our [the Court's] decisions indicate, attends only the extreme cases." *Skilling*, 130 S.Ct. at 2914-15. "Pretrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial." *Id.* at 2916 (quoting *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976)). "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut a presumption of a prospective juror's impartiality would be to establish an impossible standard." *Irvin*, 366 U.S. at 723. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* A trial court's finding of impartiality as to a juror should not be set aside unless the error is manifest. *Id.* at 723-24.

Where there is no presumed prejudice, a court looks next to whether actual prejudice infected the jury. *Skilling*, 130 S.Ct. at 2917; *see also Ritchie v. Rogers*, 313 F.3d 948, 956 (6th Cir. 2002). "To determine whether actual prejudice occurred, reviewing courts examine the nature of the voir dire and media coverage." *Turnage*, 2006 WL 2380623 at *2.

Noe has failed to demonstrate that the court of appeals' decision that there was no prejudice is contrary to or an unreasonable application of clearly established federal law. Indeed, the Sixth District Court of Appeals carefully discussed the relevant United States Supreme Court

---

[16] In *Irvin*, the Court determined that the defendant's jury was not impartial where there was intense publicity, two-thirds of the venire possessed a belief in the defendant's guilt, and voir dire examination showed that eight of the twelve jurors finally placed in the jury box thought the defendant was guilty. *Irvin*, 366 U.S. 717.

opinions as well as Ohio Supreme Court cases analyzing those opinions.  Doc. 7-1, pp. 593-597, ¶¶ 73-83.

In support of his request for relief, Noe asserts that there "was a steady and unrelenting expansion of [media] coverage."  Doc. 1, pp. 15-16.  Notwithstanding his claims regarding the extent or nature of publicity, Noe has not demonstrated that that his case falls within the very small category of "extreme cases" to which a presumption of prejudice attaches.  *See Skilling*, 130 S.Ct. at 2914-15 ("A presumption of prejudice, our [the Court's] decisions indicate, attends only the extreme cases.").  "Pretrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial."  *Id.* at 2916 (quoting *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (19*76)).

In reviewing "the volumes of articles, editorials, and cartoons" (Doc. 7-1, p. 598, ¶ 87) and analyzing clearly established Supreme Court precedent, the state court of appeals concluded that, even though it might be argued that the news media was not entirely unbiased with regard to Noe, the pre-trial publicity did not create a presumption of prejudice.  Doc. 7-1, p. 598, ¶ 87.  When discussing relevant Supreme Court precedent and application of that precedent by Ohio courts, the court of appeals indicated that "the sheer number of media reports is an inescapable result of modern technology," (Doc. 7-1, pp. 596-597, ¶ 83) (noting that the Supreme Court, in *Irvin*, 366 U.S. at 726, recognized that "In these days of swift, widespread and diverse method of communication, * * * scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.").  Noe fails to demonstrate that the court of appeals' decision that the publicity in Noe's case did not create a presumption of prejudice is contrary to or an unreasonable application of clearly established federal law.

Finding no presumption of prejudice, the court of appeals turned to the voir dire proceedings themselves to determine whether there was actual bias on the part of potential

16

jurors.  In doing so the court of appeals "found no evidence of any pervasive prejudice or bias from those called for jury service." Doc. 7-1, p. 597, ¶ 86.  More particularly, the court of appeals stated:

> {¶ 84} Importantly, the voir dire proceedings conducted by the trial court were thorough and careful. The court sent notices to approximately 175 potential jurors and a week was set aside for jury selection. The jurors were interviewed individually in groups of 10 to 12; the court was able to get its desired number of 35 potential jurors prior to going through all those who reported for jury service. Of the 35, the parties were able to seat 12 jurors and four alternate jurors.
>
> ***
>
> {¶ 86} During the course of voir dire, multiple venire persons were completely unaware of the case while several indicated that they were suspicious of the veracity and evenhandedness of the reporting of the story, particularly through the print media. After reading carefully through the entire voir dire proceedings, we can find no evidence of any pervasive prejudice or bias from those called for jury service. While there were multiple potential jurors who were dismissed based upon their preconceived belief of appellant's guilt, the majority of those dismissed were due to financial or domestic hardship based upon the length of the trial.

Doc. 7-1, pp. 597- 598, ¶¶ 84, 86 (Ex. 32).

Noe has not shown that the court of appeals' decision upholding the trial court's denial of his motion to change venue is contrary to or an unreasonable application of clearly established federal law.  Nor has he clearly articulated a claim of actual prejudice.  Without pointing to specific instances of actual prejudice, he asserts that "[s]everal hundred perspective [sic] jurors were interviewed and the majority indicated a perception that Mr. Noe was in fact guilty.  But more significantly not one of them suggested that they felt he was innocent." Doc. 11, pp. 1-2. However, as stated by the Supreme Court, "[t]o hold that the mere existence of any preconceived notion as to guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." *Irvin*, 366 U.S. at 723.  Further, as noted by the court of appeals, "[w]hile there were multiple potential jurors who were dismissed based upon their preconceived belief of appellant's guilt, the majority

17

of those dismissed were due to financial or domestic hardship based on the length of the trial."
Doc. 7-1, pp. 597-598, ¶ 86; Doc. 9-3, pp. 2-857.

As discussed above, Noe's conclusory statements and references to the extent and nature
of publicity are insufficient to demonstrate that the court of appeals' decision is contrary to or an
unreasonable application of clearly established federal law.   He has not established that the state
court's decision was "so lacking in justification that there was an error well understood and
comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby*, 132
S.Ct. at 27 (quoting *Richter*, 131 S.Ct. at 786–87).  Accordingly, the undersigned recommends
that Petitioner be denied federal habeas relief on Ground One.

## C.  Ground Two and Ground Three[17] are without merit.

In Ground Two, Noe argues that the trial court improperly allowed State's witness David
Tripp, a Sotheby's consultant, to provide expert testimony regarding the value of coins even
though the State had assured the Court and defense counsel that Tripp was not going to provide
expert testimony.[18]  Doc. 1, pp. 24-26; Doc. 11; Doc. 17-2, pp. 3-6.  He contends that the trial
court's admission of this testimony resulted in a denial of a fair trial under the United States
Constitution.  Doc. 1, p. 26.

In Ground Three, Noe argues that, once the trial court allowed Tripp to testify in the
manner that he did, the trial court improperly denied Noe the opportunity to present opinion
testimony of his own experts as to the value of the coin fund and whether there was a loss to the

---

[17] Noe raised the claims contained in his second and third ground for relief in his fourth assignment of error
in the state appellate court (Doc. 7-1, pp. 198-203 (Ex. 19) and in his second proposition of law in his Ohio
Supreme Court memorandum in support of jurisdiction (Doc. 7-1, pp. 692-694 (Ex. 34)).

[18] As part of his Ground Two argument, Noe asserts that the State, with the intent to prejudice the rights of
Petitioner, deliberately and repeatedly denied that the State intended to offer Tripp as an expert. *See* Doc.
17-2, p. 6.  To the extent that Noe is attempting to raise a claim of prosecutorial misconduct in his Traverse,
his Petition does not contain such a claim.  Thus, since a court is not required to address a theory of relief
asserted only in a traverse but not in the habeas petition, *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir.
20 05); *Jalowiec v. Bradshaw*, 657 F.3d 293, 311-312 (6th Cir. 2011), such a claim is not properly before
this Court.

State.   Doc. 1, p. 29; Doc. 11, pp. 2-4; Doc. 17-2, p. 7.  He contends that the trial court's denial of this testimony resulted in a denial of a fair trial under the United States Constitution.  Doc. 1, p. 29.

Generally, a petitioner's complaint regarding a state court's ruling on the admissibility of evidence does not present a cognizable federal habeas claim.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Bell v. Arn*, 536 F.2d 123, 125-126 (6th Cir. 1976).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle*, 502 U.S. at 67-68.  Only where an error in a state evidentiary ruling is so prejudicial that it deprives the defendant of due process and a fair trial will such a claim warrant federal habeas relief.  *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1983).

The court of appeals determined that the trial court's admission of Tripp's testimony was harmless (Doc. 7-1, p. 603, ¶ 102) and that the evidence Noe sought to present regarding the value of the fund and there being no loss to the state was not relevant to the determination of Noe's guilt or innocence of the charges in the indictment (Doc. 7-1, p. 604, ¶ 106).  More particularly, in addressing Noe's claim regarding Tripp's testimony, the court of appeals described the facts and analyzed the issues as follows:

{¶ 95} Appellant first argues that the trial court erred by allowing witnesses David Tripp and Thomas Wersell[19] to testify as to the value of the coins seized during the search of VCC. Appellant stresses the fact that Tripp refused to meet with defense counsel prior to trial.

{¶ 96} During direct examination, David Tripp testified regarding his extensive education and his employment as a numismatic consultant, appraiser, and author. Tripp had been employed at Sotheby's auction house and was currently a self-

_____

[19] Included in Noe's fourth assignment of error were other evidentiary challenges, not raised in his Petition before this Court, that the court of appeals also found not to be well-taken.

employed consultant with the company. Tripp was questioned regarding his knowledge of coins; specifically, the quality and value of rare coins. At this point, appellant's counsel objected and indicated to the judge the representations by the state that Tripp was to be a fact witness only and not be qualified as an expert to give an opinion as to the value of the coins seized at VCC. The state responded that Tripp was going to be asked only one question about value in relation to the inventory document prepared by VCC employee, Timothy LaPointe.

{¶ 97} Tripp then testified that in 2005, through Sotheby's, he was contacted by the state of Ohio's Auditor's Office about an appraisal and inventory of a numismatic investment.[FN2] Tripp traveled to Maumee, Ohio, and, with BWC officials and law enforcement, he first entered VCC on May 25, 2005. On that date, the inspectors viewed only historical collectibles; Tripp testified that they were surprised to find collectibles because it was believed that the BWC investment contained only coins.

> FN2. These inventories, conducted by additional Sotheby's personnel, were simultaneously taking place at the Coin Funds' subsidiaries in Delaware, Pennsylvania, Colorado, and Florida.

{¶ 98} Tripp testified that on May 26, 2006, they were allowed full access to the Coin Fund inventories. Tripp stated that based upon the inventory lists he had received there did not appear to be enough coins. Tripp testified that they worked from the inventory sheets prepared by VCC employee, Timothy LaPointe. Tripp stated that for CCF I, the five coins in the inventory were present and totaled $63,500. He indicated that based on his experience this was a "fairly correct" ballpark value. The inventory sheet for CCF II had 120 coins listed with a value of $307,155; Tripp stated that the prices "pretty much" reflected the market prices. Finally, Tripp testified as to the RCE coins which had a total purchase price of $781,175; however, Tripp stated that a $610,000 coin was not found. Finally, Tripp commented that "when you have a total aggregate value of 1.1 million and half of it is missing in one coin, it's a fairly heart-stopping moment." Tripp further indicated that other coins found at VCC were of insignificant numismatic value.

\*\*\*

{¶ 100} Appellant contends that the above testimony was impermissible because the state presented no other expert testimony as to the value of the coins seized from VCC, and that the state's theory was that they had expected to find over $13 million dollars worth of coins at the time of the search warrant. Conversely, the state asserts that Tripp simply testified as to the inventory lists created by Timothy LaPointe, and admitted into evidence without objection, prior to the execution of the search warrant. The only value testimony provided by Tripp was whether the price listed for each coin was "reasonable in the world of coin collecting."

{¶ 101} The line between expert testimony under Evid.R. 702 and lay opinion testimony under Evid.R. 701 is not always clear. Obviously, because Tripp was physically present during the Maumee inventory he had the personal knowledge necessary to testify as a fact witness. Tripp testified regarding the inventories prepared by Timothy LaPointe and whether the purchase price listed for the coins was reasonable. The accuracy of the inventories was an issue raised by the defense but it was not material to the nature of Tripp's testimony. Tripp simply testified to what was on the list compared to what they found at VCC. As noted by the state, in the rare coin market, it was reasonable to presume the value of the coins based upon their purchase price. *State v. Awad,* 164 Ohio App.3d 528, 843 N.E.2d 201, 2005-Ohio-5861, ¶ 33. The defense did not object to the admission of the inventory lists.

{¶ 102} With regard to appellant's ability to interview Tripp prior to trial, based on the nature of the case and Tripp's knowledge and status in the coin industry, a pre-trial interview may have been advantageous. However, based upon the fact that the inventory lists were admitted and deemed to be a reflection of the value of the coins, any error in the admission of Tripp's and Wersell's testimony was harmless.

Doc. 7-1, pp. 600-603, ¶¶ 95-98, 100-102.

Further, when addressing Noe's claim that the trial court improperly denied him the opportunity to submit evidence as to the value of the Coin Funds, the court of appeals stated:

{¶ 103} Appellant next argues that the trial court abused its discretion when it granted the state's motion in limine to exclude appellant's testimony as to the value of the Coin Funds. In particular, appellant wished to demonstrate that the Coin Funds actually returned a $10 to $13 million dollar profit. The state counters that appellant was permitted to present evidence of the value of the fund during the period in which he was a manager; their motion only excluded the period after May 24, 2005, when appellant was removed as manager.

{¶ 104} In its October 16, 2006 motion in limine, the state argued that evidence of the value of the Coin Funds after May 25, 2005, was not relevant to any of the charges. In opposition, appellant argued that in order to prove that a theft occurred, the state was required to prove that, pursuant to R.C. 2913.01(C), appellant intended to retain the money for a time as to appropriate "a substantial portion of its value" or that he disposed of the money "so as to make it unlikely that the owner will recover it." Appellant argued that his advances on his profit distributions, to which he was entitled, could not be calculated without determining the actual amount of the profits. Appellant also took issue with the state's characterization of "post-Noe" coin fund assets, stating that following his removal as manager, the state, through Development Specialists Inc., merely liquidated the assets acquired by appellant during his tenure.

21

{¶ 105} Granting the state's motion, the trial court concluded that "testimony regarding the Coin Fund's valuation subsequent to the defendant's management and possession" or "[e]vidence of a prospective ability to repay is not relevant to the charges contained in the indictment nor could such evidence make any fact of consequence more or less probable."

{¶ 106} Based on the foregoing, we likewise conclude that the presentation of such evidence was not relevant to the determination of appellant's guilt or innocence regarding the charges in the indictment.

Doc. 7-1, pp. 604-605, ¶¶ 103-106.

After reaching the foregoing conclusions, the court of appeals concluded that Noe's fourth assignment of error was not well-taken.  Doc. 7-1, p. 606, ¶ 111.

Noe's claims of prejudice are conclusory and do not demonstrate that the state courts' evidentiary rulings were so prejudicial that he was denied due process and a fair trial.  Indeed, Noe's own statements regarding the effect of the trial court's evidentiary rulings on the outcome of the case undermine his claims of prejudice and support the court of appeals' conclusion that the trial court's evidentiary rulings were not prejudicial to him.  For example, Noe acknowledges that Tripp's "testimony was not controlling as to the outcome of the various counts against him." Doc. 1, p. 26.  Also, while Noe argues that testimony from his experts "as to the value of the fund and to the fact that there would be no loss to the State . . . was certainly relevant as a fair rebuttal of the inferences the State had injected in the case through the testimony of Mr. Tripp," he also admits that such testimony "might not have been directly relevant to the charges against him." Doc. 1, p. 29.

Based on the foregoing, even if the Court were to conclude that the trial court incorrectly allowed Tripp to testify in the manner that he did and/or improperly denied admission of Noe's proposed expert testimony, federal habeas relief would not be warranted because Noe has failed to demonstrate that admission of that evidence was so prejudicial that it deprived him of due process and a fair trial.  *Cooper*, 837 F.2d at 286.

22

## IV. Conclusion and Recommendation

For the reasons set forth herein, the undersigned finds that Petitioner Thomas W. Noe's three grounds for relief are without merit and recommends that his Petition for federal habeas corpus relief be **DENIED**.


Dated: June 20, 2013

Kathleen B. Burke
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

23